POTTERS MEDICAL CENTER, INC., APPELLANT, *v.* RATCHFORD, SUPT. OF
INSURANCE, ET AL., APPELLEES.

[Cite as Potters Medical Center, Inc. *v.* Ratchford
(1985), 18 Ohio St. 3d 253.]

(No. 84-986—Decided July 24, 1985.)

*Cloppert, Portman, Sauter & Latanick, Robert W. Sauter* and *Walter J. Gerhardstein,* for appellant.

*Anthony J. Celebrezze, Jr.,* attorney general, and *Barry W. Moses,* for appellee Superintendent.

*French, Marks, Short, Weiner & Valleau* and *Edward G. Marks,* for appellee Hospital Care Corporation.

*Venable, Baetjer, Howard & Civiletti, Benjamin R. Civiletti, Cavitch, Familio & Durkin Co., L.P.A.,* and *E. John Brzytwa,* urging reversal for *amicus curiae* city of Lakewood, d.b.a. Lakewood Hospital.

*Carol M. Lamm* and *Marilyn B. Cassidy,* urging affirmance for *amicus curiae* Blue Cross & Blue Shield of Northern Ohio.

WRIGHT, J. Blue Cross may elect not to contract with Potters if it is found that Potters has not complied with the cost control objectives set forth in R.C. 1739.01(M),[1] or if it is ultimately determined that Potters did

---

[1] R.C. 1739.01(M) provides the following cost control objectives:

"(1) Elimination of duplicative or unnecessary services and facilities;

"(2) Nonprovider participation in plan affairs;

"(3) Subscriber support of cost containment activities;

"(4) Promotion of sound management practices in member health care facilities;

"(5) Implementation of sound plan management practices;

"(6) Promotion of alternative forms of care;

"(7) Engagement in, and evaluation of, cost control experiments, including incentive reimbursement and utilization review programs;

not comply with the much broader quality of care standards contained in R.C. 1739.01. This legislative mandate is evidenced by R.C. 1739.06 which provides, in part: "* * * A hospital service association may elect not to contract * * * with a hospital, * * * if that hospital, * * * fails to comply with the quality of care standards contained in the appropriate definition of such hospital, * * * in section 1739.01 of the Revised Code, or fails to comply with the cost control standards as set forth in division (M) of section 1739.01 of the Revised Code." It would appear from a careful reading of *Blue Cross* v. *Jump* (1980), 61 Ohio St. 2d 246 [15 O.O.3d 257], that the Superintendent has been empowered by R.C. 1739.051[2] to pass reasonable regulations implementing these standards.

These legislative and administrative grants of power are not, however, left to the unfettered discretion of Blue Cross and the Superintendent. Ohio's Valentine Act, as contained in R.C. Chapter 1331, and federal antitrust laws require freedom from *unreasonable* restraint of trade. We have consistently declared invalid transactions whose purpose was to eliminate competition. See *List* v. *Burley Tobacco Growers' Co-op. Assn.* (1926), 114 Ohio St. 361; *Lufkin Rule Co.* v. *Fringeli* (1898), 57 Ohio St. 596; *Central Ohio Salt Co.* v. *Guthrie* (1880), 35 Ohio St. 666. Thus, precise compliance with the regulatory scheme as noted above is required before there can be judicial approval of Blue Cross' refusal to contract with Potters.

A careful review of the record reveals that the sole reason posited by the Superintendent in approving the action by Blue Cross was the fact that HSAEO decided not to approve Potters' Section 1122 application. In approving Blue Cross' action, the Superintendent made no independent determination of any of the criteria set forth in R.C. 1739.01(M), but instead adopted the recommendation of the hearing officer which states, in part:

"* * * The addition of any new unnecessary or duplicative facility and service necessarily increases the cost of care because it adds additional fixed costs to the health care system.

"Additional facilities may increase the competition among the hospitals in the Eastern Ohio area but such competition is likely to increase, not decrease, hospital costs to the community as a whole. * * * Any gain by one facility will be at the expense of another facility * * *."

The record is almost devoid of evidence to support this finding.[3]

---

"(8) Adoption of other cost containment policies as determined by the superintendent of insurance."

[2] R.C. 1739.051(D) provides in part: "The superintendent shall develop rules and reporting requirements to indicate activities necessary to establish a good faith effort to control costs."

[3] The evidence indicates that Potters' average cost per bed is $216 per day while other hospitals in Potters' area average a cost of $380 per day. Other hospitals outside Potters' area charge as much as $467 per day for the same services provided by Potters. Further, the evidence indicates that Potters provides special medical services that are not available at

However, more importantly, neither Blue Cross nor the Superintendent independently dealt with the criteria set forth in R.C. 1739.01(M). The misplaced reliance on HSAEO's report was exacerbated by the fact that even the HSAEO report did not give definitive reasons for its decision to not endorse Potters' application for reimbursement of certain of its capital improvements expenditures. Thus, we face a situation where both Blue Cross and the Superintendent failed to examine the appropriate statutory criteria and instead relied on the report of an agency which had a mission unrelated to the responsibilities placed on the Superintendent and Blue Cross by law. Although we quite agree that medical costs in our state should and must be contained, we cannot condone this type of review.

Blue Cross and the Superintendent appear to be preoccupied with the number of beds in the greater Eastern Ohio area instead of the containment of hospital care costs. We recognize that a plethora of hospital beds may well lead to higher costs due to the fact that hospitals with a low census have a tendency to raise their per diem rates to meet their overhead costs. It would appear that this phenomenon is at war with generally accepted laws of the market-place. It is also in conflict with the underlying premise of the legislative and administrative scheme discussed above. Moreover, it must be noted from the record before us that, at the time of the hearing herein, Potters had an above-average occupancy rate, lower rates than its competition, and every expectation of continuing a successful and highly competitive operation. Thus, Blue Cross' denial of Potters' participation achieved a result that is exactly opposite the goal of the regulatory scheme which, of course, is the encouragement of efficient, highly-utilized facilities.[4]

R.C. 1739.051 requires that Blue Cross make a "good faith effort" to control costs. The posture adopted by Blue Cross is not that Potters take steps to eliminate duplicative unnecessary services and the like, but rather that Potters should pass from the scene. Assuring Potters' competitors that they will not be subject to the rigorous competition of a new facility does not constitute a "good faith effort" to control costs. Thus, we hold that, in a proceeding pursuant to R.C. 1739.06, a hospital service association must enter into a participating hospital contract absent a showing that an otherwise qualified hospital fails to meet the criteria set forth in R.C. 1739.01(B) and (M). Accordingly, the order of the Superintendent being unsupported by reliable, probative, and substantial evidence and not in

other hospitals in Potters' area and, therefore, residents of Potters' area must travel to large metropolitan areas to receive these services.

[4] The report of the Oversight Subcommittee on Am. H.B. No. 448, which amended R.C. 1739.06 effective June 18, 1976 to allow hospital service associations to contract with for-profit hospitals, states that "the sponsors of House Bill 448 * * * [hoped to encourage] greater competition in the health care sector by allowing proprietary institutions access to Blue Cross reimbursement."

accordance with law, we must reverse the judgment of the court of appeals and remand the cause to the Superintendent for further proceedings consistent with this opinion.

*Judgment reversed.*

CELEBREZZE, C.J., SWEENEY, LOCHER and C. BROWN, JJ., concur.

HOLMES and DOUGLAS, JJ., dissent.

HOLMES, J., dissenting. Because I believe the Superintendent's administrative decision was supported by reliable, probative, and substantial evidence, I dissent. The application by Potters Medical Center was premised on its assertion that it was not a duplicative or unnecessary facility under the cost control standards of R.C. 1739.01(M). The application for preferred status was not made until after the hospital was completed and functioning. Thereafter, Potters was determined to be unqualified to receive Section 1122 reimbursements for capital expenditures under the Social Security Act precisely because Potters duplicated already available services. Blue Cross refused the offer to contract after concluding Potters would duplicate area health services.

The hearing officer determined that there was a stable or declining pool of patients and physicians. Also, there was an existing oversupply of hospital beds in the community. The multiplication of beds and duplication of health care services, far from creating useful competition, creates instead an increase in per patient cost of care. Blue Cross, therefore, had a clear reason for refusing Potters' contract.

The General Assembly intended to give Blue Cross effective power to refuse to contract at a preferred rate with any hospital not qualified under R.C. 1739.01(M). If a hospital may force Blue Cross to contract with it, then Blue Cross has no means of forcing such institutions to contain their costs. The decision today removes that leverage and allows an inefficient resource allocation which will invariably lead to higher health care costs.

Accordingly, I would affirm the court of appeals.

DOUGLAS, J., concurs in the foregoing dissenting opinion.

DOUGLAS, J., dissenting. The majority concludes its opinion by remanding this case to the Superintendent "for further proceedings consistent with this opinion." Because I am at a loss as to what type of action this court is mandating and the resulting consequences of the remand, I must respectfully dissent.

The syllabus of this case provides that "a hospital service association must enter into a participating hospital contract absent a showing that an otherwise qualified hospital fails to meet the criteria set forth in R.C.

1739.01(B) and (M)." In the body of the opinion, the majority stresses that the Superintendent failed to examine or deal independently with the criteria set forth in R.C. 1739.01(M). One might assume, then, that the majority is remanding this case in order to force the Superintendent to consider each criterion set forth in divisions (B) and (M) of R.C. 1739.01.

There are six criteria which must be met in order to qualify as a "hospital" pursuant to the definition set forth in R.C. 1739.01(B). Eight objectives, designed to control costs, are enumerated in R.C. 1739.01(M).

Under the majority's view, the Superintendent must seemingly examine each of these criteria. Assume that the Superintendent does so. May the Superintendent then lawfully determine that a hospital service association has failed to satisfy R.C. 1739.01(M) if it is determined that all but one of the eight listed criteria have been met? What is the mandated result if only four of the eight criteria are met? Is a balancing test to be employed or is it an all or nothing proposition? The majority fails to address this issue.

Without more guidance, it would seem the majority would be satisfied if the Superintendent perfunctorily entered into the record that he had considered each element and that the hospital had failed to meet one or more of the criteria. In fact, the Superintendent did find that one of the required elements had not been met. Should he then have gone further and buttressed his decision by cumulative evidence saying that, in addition, other of the standards had not been satisfied? The question seems to remain: "How much is enough?"

It would appear, at least from my reading of the majority opinion, that upon remand the Superintendent could again decide that Blue Cross need not elect to contract with Potters so long as the Superintendent noted that he had considered each criterion listed in (B) and (M). Then, apparently the majority would give the Superintendent's decision its stamp of approval. I submit that such action would be meaningless and a waste of time, the Superintendent having already found that appellant had failed to meet one of the key provisions entitling appellant to a participation contract.

Medical cost containment was the goal of federal and state officials in promulgating regulations and statutes such as the one now before us. If we say that a hospital association *must* enter into a participating hospital contract absent a showing that the hospital fails to meet the criteria set forth in R.C. 1739.01 (B) and (M) (and I am not at all sure that such is a mandatory reading of R.C. 1739.06), then, having required the association to so contract and, in effect, frustrating its efforts at cost containment as mandated by the legislature, it would seem that we, by judicial decree, have effectively discouraged any effort by the Superintendent of Insurance and/or Blue Cross to carry out the legislative mandate. One might wonder, as the Superintendent and Blue Cross must, what can be done by any person or organization to meet the goals of medical cost containment, given today's majority decision.

Accordingly, I respectfully dissent.